**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-111 (JEB)** |
| **v.** | : | |
| | : | |
| **CHARLES HAND, III,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Charles Hand, III to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

I.      **Introduction**

Defendant Charles Hand, III, (hereinafter, "C. Hand") participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on October 14, 2022, (ECF No. 25 at ¶ 6) reflects a sum of more than $2.7 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

C. Hand pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of incarceration is appropriate in this case because (1) C. Hand continued into the Capitol after witnessing downed fencing, tear gas being deployed against rioters, and attacks on police officers; (2) he broke off a piece of a metal fence while on restricted grounds of the Capitol and placed it in his back pocket; (3) once inside,  C. Hand and members of the mob chanted "take it back"; (4)  C. Hand then traveled to multiple areas within the Capitol, gave rioters affirmation after seeing them climb on statues, and attempted to intervene in a fight between police and rioters;  (5) after the riot, C. Hand demonstrated a lack of remorse,  posting to Facebook that he witnessed "thousands of angry Americans marching into the Capitol to protest and stop the certification of what I personally believe to be an election stolen from the American people"; and a few weeks after January 6; and (6) C. Hand sent his wife a text message stating, "Y'all do know not to admit to anything and for god's sake don't turn yourself in. D.C. They looking for bigger fish. Every one is asking about y'all. Deny deny deny."

The Court must also consider that C. Hand's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of C. Hand's crime support a sentence of incarceration in this case. But for his actions alongside so many others, the riot likely would have failed. Here, the C. Hand's participation in a riot that succeeded in halting the Congressional certification, one of his stated goals, combined with his lack of remorse, a sentence of incarceration is appropriate in this case.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 25 (Statement of Offense), at ¶¶ 1-7.

*C. Hand's Role in the January 6, 2021 Attack on the Capitol*

On or before January 6, 2021, C. Hand and Mandy Robinson-Hand ("Robinson-Hand"), his wife, traveled to Washington, D.C., from their home in Butler, Georgia, to attend the "Stop the Steal" rally.

After attending the former President's rally, C. Hand and Robinson-Hand advanced with a crowd to the western side of Capitol.



*Picture from Robinson-Hand's cellphone with C. Hand next to her out of frame*

While on the restricted grounds on the western side of the Capitol, C. Hand and Robinson-Hand observed downed fencing, were exposed to tear gas, police officers holding back the mob, and attacks on police officers.



*Image from a video on Robinson-Hand's phone of broken fencing*

Upon seeing the fencing, C. Hand broke off a piece of the fencing, snapped it in half, and placed a baton-like piece of fencing in his back pocket. C. Hand lost this metal baton at some point during his advance towards the Capitol.



*Side-by-side showing C. Hand breaking the fence and placing it in his pocket (Exhibit 1)*

A video (Exhibit 2) retrieved from Robinson-Hand's phone shows tear gas being deployed in the mob and the mob yelling at police to "Stand down." Robinson-Hand can be heard saying, "Today's the day." C. Hand, in his red University of Georgia hat, is nearby as a member of the mob yells out, "You are traitorous bitches" and another rioter yells "hang them all." The mob then begins chanting, "hang them high." Undeterred, C. Hand and Robinson-Hand watched as the mob broke through police lines and stormed up the Lower West Terrace steps.

C. Hand and Robinson-Hand advanced with the mob towards the Senate Wing Door on the northwest side of the Capitol. Shortly thereafter, C. Hand and Robinson-Hand entered the Capitol Building through the Senate Door approximately fifteen minutes after the window immediately adjacent to the door was smashed out using a riot shield. The U.S. Capitol was first breached in this location by a rioter who jumped through the window over the broken glass.

At 2:26 p.m., approximately fifteen minutes after the first breach of the Capitol, C. Hand and Robinson-Hand entered the U.S. Capitol through the Senate Wing Door.



*C. Hand and Robinson-Hand circled in red above*

Prior to entering the Capitol, Robinson-Hand took her cellphone out a recorded her entry (Exhibit 3) with C. Hand. C. Hand and Robinson-Hand enter the Capitol through the Senate Wing Door at 2:26 p.m. During their entry, you can hear the crowd, including C. Hand, chanting, "take it back," as the fire alarm rings loudly in the background. The broken glass in the Senate Wing Door is also visible on Robinson-Hand's video as she is entering the Capitol. After entry, they turned to the right and walked past the shattered glass on the floor from the smashed-in window. From there, C. Hand and Robinson-Hand traveled through the Crypt.

While in the Crypt, Robinson-Hand utilized her cellphone to record C. Hand holding a flag and assisting another rioter in placing the flag in statutes' hands.



*C. Hand assisting a rioter place a flag on a statute and giving a thumbs up (Exhibit 3)*

  C. Hand and Robinson-Hand then proceeded to the Capitol Visitor Center. During C. Hand and Robinson-Hand's time in the Visitor Center, rioters were fighting police officers, threw chairs at them, and pushing through tear gas to chase retreating officers. After seeing one of these altercations, C. Hand attempted to move towards one of the altercations but was stopped by Robinson-Hand.



*Chair being thrown at officers only feet from C. Hand*



*C. Hand and Robinson-Hand pushing through tear gas*

C. Hand and Robinson-Hand then proceeded back up to the Crypt, down a hallway near the

house Wing Door, and into the Hall of Columns.



*C. Hand and Robinson-Hand circled in red traveling through the Capitol*

At 2:45 p.m., C. Hand and Robinson-Hand exited the Capitol through the South Door

Vestibule, which is located on the first floor at the southernmost part of the Capitol.



*C. Hand and Robinson-Hand exiting the Capitol*

In total, C. Hand and Robinson-Hand spent nearly 20 minutes inside of the Capitol.

However, after leaving the Capitol C. Hand and Robinson-Hand were not done. They did not go

home, they instead circled around to the Memorial Doors on the East side of the Capitol.

On January 7, 2021, C. Hand posted on Facebook regarding his time in the Capitol. He described himself as "an eye witness of the storming of the United States Capitol on 1-6-2021" and said that he was "on the scene from 1:30pm to 4:00pm." He stated that he "saw makeshift fencing that had been torn down," a crowd of people "rushing the Capitol Police," for which "tear gas, rubber bullets, mace and etc wasn't stopping them" and "[t]housands upon thousands of angry Americans marching onto the Capitol to protest and stop the certification of what I personally believe to be an election stolen from the American people." On January 18, 2021, C. Hand sent his wife a text message stating, "Y'all do know not to admit to anything and for god's sake don't turn yourself in. D.C. They looking for bigger fish. Don't sweat the small stuff. Every one is asking about y'all. Deny deny deny." That same day, C. Hand sent Robinson-Hand a message stating, "Like I said it was a perfect time to be a. Part of history!"

Despite his statements, both C. Hand and Robinson-Hand have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and they paraded, picketed, or demonstrated in the Capitol Building.

*C. Hand's Interview*

On March 11, 2022, C. Hand gave a voluntary post-arrest interview to the FBI. During the interview, he admitted traveling to Washington D.C. with Robinson-Hand. C. Hand stated he watched President Trump speech from near the Washington Monument and he and Robinson-Hand left the rally early for the Capitol to "get good seats." On the way he stopped at the Department of Justice to yell at them to "do their job."

Approaching the Capitol, the first perimeter had already been breached, and they kept walking towards the Capitol. C. Hand stated he started seeing fewer "MAGA" hats and more tactical gear. He stated the atmosphere was different, "more militant," and people were

everywhere. He saw tear gas being deployed and during all this the crowd started going through the scaffolding. Then lines formed and he did not know what he was doing at this point. He stated he knew the election was stolen, C. Hand, Robinson-Hand, and the crowd were screaming, and they single-file line walked inside.

C. Hand stated they were like tourists walking around. He stated he went into the ladies' room with Robinson-Hand because "the world's burning down," referring to the chaos in the Capitol. He stated while he was inside he saw individuals "knocking shit off the walls" and he told them they "were not there for that." C. hand stated he was approached by an individual in police type gear who told him they needed to get the women out of here. He stated he and Robinson-Hand walked around for five or ten minutes without seeing anyone and stated he saw officers who were leaning against the wall. He and Robinson-Hand then left the Capitol.

After leaving, he and Robinson-Hand circled back around the Capitol to another part of the Capitol. He thought this was safer and closer to what he thought a protest would be. C. Hand said after leaving that day he reached out to local law enforcement, his cousin, who told him that "the feds are slow" and that they would come to you, just wait. C. Hand stated his purpose of being there was to protest.

C. Hand was asked by agents about whether he broke fencing and he said he did not remember. He said he remembered seeing fencing that was already broken on the ground.  He said he broke off a piece it to protect someone from getting hurt on it. Agents showed C. Hand a photo of him with the metal piece in his back pocket and he said he did not remember putting it in his pocket, but that he knows he did not do it to hurt someone.

*The Charges and Plea Agreement*

On March 4, 2022, the United States charged C. Hand by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 11, 2022, law enforcement officers arrested him in Butler, Georgia. On March 31, 2022, the United States charged C. Hand by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 14, 2022, pursuant to a plea agreement, C. Hand pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, C. Hand agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

C. Hand now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the C. Hand faces up to six months of imprisonment and a fine of up to $5,000. The C. Hand must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 30-days incarceration and $500 in restitution.

### A. The Nature and Circumstances of the Offense

"The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing C. Hand's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like C. Hand, the absence of violent or destructive acts is not a mitigating factor. Had C. Hand engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in C. Hand is his persistence to get into the Capitol Building. C. Hand was exposed to tear gas and saw rioters being hit with tear gas. He heard rioters yelling "You are traitorous bitches" to police officers and another rioter yell "hang them all." Rioters all around C. Hand then chanted, "hang them high." He saw police defending the Capitol and being assaulted by rioters. He observed broken fencing and decided he wanted to further break it, snapping off a metal piece, breaking it in half, and placing it in his back pocket.

As C. Hand entered the Capitol, he saw broken windows and heard fire alarms. Once inside, he witnesses rioters fighting police and members of the mob taking things off the wall. At one point he even moved to engage with rioters who were involved in an altercation with police. C. Hand's reaction to seeing this violence and property destruction, which he later described to agents

"as if the world was "burning down," was to continue further into the restricted area, further into the Capitol.

C. Hand was in the Capitol for almost 20 minutes. He traveled to multiple locations including the Senate Wing Door, the Crypt, the Visitor Center, and the hallways near the House of Representatives. Even after leaving the Capitol, he did not leave the restricted grounds. He and Robinson-Hand instead circled the Capitol and joined the mob outside the Memorial Doors just outside the Rotunda. There cannot be a riot without the mob. C. Hand's persistence to remain in and around the Capitol building and on restricted grounds enabled the riot to continue.

C. Hand's remorse comes too late. Despite being cooperative with law enforcement during his interview, his actions in the days following January 6, 2021, paint a different picture. On January 18, 2021, he told his wife to "Deny deny deny." He was not remorseful after seeing police officers attacked that day, after seeing property destruction, after seeing the Certification of the Electoral College Vote obstructed by the mob. Even after January 6, 2021, he was excited to have been "Part of history." Today, his only concern is being held accountable for his actions.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B. The History and Characteristics of C. Hand.**

As set forth in the PSR, C. Hand's criminal history consists of a misdemeanor arrest for Criminal Trespass and Driving Under the Influence of Alcohol in 2005, which resulted in an order of restitution and fees, and a 2010 arrest for the same offenses, which also resulted in the imposition of fees. ECF 29 ¶¶ 25-26.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

C. Hand participated in the riot on January 6, despite watching rioters assaulting police and seeing the destruction of property around him.  He then celebrated his participation in the riot, telling his wife, "Like I said it was a perfect time to be a. Part of history!".  He then encouraged his wife to not turn herself in and to "Deny, deny, deny."  A sentence of incarceration is warranted to underscore that his conduct was criminal, and to deter C. Hand from engaging in lawless conduct in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence C. Hand based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

C. Hand has pleaded guilty to Count 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*,

---

[2] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among co-defendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than co-defendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C.

Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense

has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The most comparable case is C. Hand's co-defendant, Robinson-Hand. The government is recommending 45 days' incarceration for Robinson-Hand. Robinson-Hand entered at the same time, at the same location, and traveled throughout the Capitol with C. Hand. However, Robinson-Hand's text messages and social media posts before, during, and after her entry into the Capitol are aggravating. Additionally, Robinson-Hand has a more significant criminal history with four felony convictions arising from one case. Because of these additional aggravating factors, the government is requesting 45 days' incarceration for Robinson-Hand and only 30 days' incarceration for C. Hand.

In *United States v. Jordan Revlett*, 21-cr-281 (JEB), the defendant pled guilty to misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, picking, or demonstrating in the Capitol building). Revlett was in the Capitol building for approximately 30 minutes, traveled to D.C. with his family, took a number of photographs in the Capitol, shared videos and images on social media, used a bullhorn in the Rotunda, and joined in chants with the mob. When interviewed by agents, she falsely claimed he was invited into the Capitol by the FBI. Gov. Sentencing Memo., *United States v. Jordan Revlett,* 21-cr-281 (JEB), ECF 39 at 2. The government asked for a 30-

day sentence followed by 36-months of probation. *Id.* at 1. Revlett received a sentence of 14-days incarceration followed by a term of one year probation. *United States v. Jordan Revlett*, 21-cr-281 (JEB), ECF 44.

Like Revlett, C. Hand was in the Capitol for more than a few minutes, but less than one hour. C. Hand also traveled to Washington D.C. with his family, he and Robinson-Hand took several photographs and videos outside and inside the Capitol, he posted about January 6 on social media, and he joined in chants with the mob. Like Revlett, C. Hand should be sentenced to incarceration.

In *United States v. Rafael Valadez*, 21-cr-695 (JEB), the defendant pled guilty to misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, picking, or demonstrating in the Capitol building). Valadez entered the Capitol through the Senate Wing Door ten minutes after it was initially breached, he took videos of members of the mob entering the Capitol and within the Capitol, was part of the mob that pushed past officers in the Crypt, and did not express remorse for his actions. Gov. Sentencing Memo., *United States v. Rafael Valadez*, 21-cr-695 (JEB), ECF 27 at 2. The government asked for a 30-day sentence followed by 36-months of probation. *Id.* at 1. Valadez received a sentence of 30-days incarceration. *Rafael Valadez*, 21-cr-695 (JEB), ECF 30.

Like Valadez, C. Hand entered the Capitol through the Senate Wing Door shortly after Valadez, he and Robinson-Hand took several photographs and videos outside and inside the Capitol, and he did not show remorse after January 6. Similar to Valadez, C. Hand should be sentenced to 30 days' incarceration.

**V.      This Court is authorized to and should impose a term of incarceration as a condition of probation pursuant to 18 U.S.C. § 3563(b)(10).**

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release. 18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[3]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation.  18 U.S.C. § 3653(b)(10).  Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation.  *Id.*  Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation.  *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10).  Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

---

[3] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10). *See Anderson*, 787 F. Supp. at 539. Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v.*

*Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation).   Imposing an intermittent confinement sentence with 30 days' incarceration as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.   At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[4]

## VI.   A sentence imposed for a petty offense may include both imprisonment and probation.

The government's recommended sentence of 30 days' incarceration and 36 months of probation is also permissible under 18 U.S.C. § 3561(a)(3).   As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses."   *Little*, 590 F.Supp.3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).   Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a

---

[4]   *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Nov. 21, 2022).

single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[5]

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence C. Hand to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:          */s/ Brian Brady*
Brian Brady
Trial Attorney, Department of Justice
DC Bar No. 1674360
1301 New York Ave. N.W., Suite 800
Washington, DC 20005
(202) 834-1916
Brian.Brady@usdoj.gov

---

[5] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.